# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANNE WILLIS, as the Personal Representative of the Estate of Lila G. Inskeep, and ANNE WILLIS, as an individual. | : : : : | C.A. No. N25C-10-217 KMV |
| Plaintiffs, | : : : | |
| v. | : : | |
| SUPPORTIVE CARE SOLUTIONS LLC, a domestic limited liability company, ERIC MERLINO, an individual. | : : : : | |
| Defendants. | : : | |

Submitted: February 19, 2026
Decided: August 11, 2026

*Upon Defendants' Supportive Care LLC
and Eric Merlino's Motion to Dismiss -*
**GRANTED**, in part, and **DENIED**, in part.

Shakuntla L. Bhaya, Esq. Doroshow, Pasquale, Krawitz & Bhaya, Newark, Delaware, *Counsel for Plaintiffs*

Eric Scott Thompson, Esq. Marshall Dennehey, PC, Wilmington, Delaware, *Counsel for Defendants*

**Vavala, J.**

# I.    INTRODUCTION

This matter concerns an adult guardianship over an elderly disabled woman who lived with her son until her death in 2023.  A bitter relationship existed between the woman's son and daughter, the plaintiff, who both sought control over her affairs to varying degrees.  In 2020, the siblings consented to the Court of Chancery's appointment of a professional guardian over the woman's person and property.  In 2021, however, the Court of Chancery, having determined the woman's disability had partially resolved, terminated the guardianship over her person and limited the guardianship over her property.

Sadly, law enforcement officers discovered the mother and son deceased in their shared residence in late 2023.  Contending the professional guardian deficiently performed its court-ordered obligations and failed to conduct a welfare check it voluntarily agreed to perform, plaintiff filed a civil complaint in Superior Court asserting claims of breach of fiduciary duty, negligence, and wrongful death against the guardian.

The Court considers here whether any of these claims must be dismissed for lack of jurisdiction under Rule 12(b)(1) or failure to state a claim upon which relief may be granted under Rule 12(b)(6).  Construing the record in the light most favorable to the nonmovant plaintiff, the Court concludes Count V (breach of fiduciary duty) and portions of Counts I, II, III, IV, VI, and VII must be dismissed

because the Superior Court lacks jurisdiction over claims of breach of fiduciary duty by a court-appointed guardian. But at this early stage of the proceedings, further discovery is needed to determine whether plaintiff has stated viable claims against the guardian, for undertaking and breaching legal duties outside its role as a fiduciary.

Accordingly, defendants' motion to dismiss under Superior Court Civil Rule 12(b)(1) is **GRANTED in part and denied in part**. Defendants' Rule 12(b)(6) motion to dismiss is **DENIED**. Given that the lion's share of the factual allegations in the Complaint relate to the exercise of a Court of Chancery-appointed guardian's fiduciary duties, this matter may be better handled by that court, which may exercise jurisdiction over any legal claims under the Clean Up Doctrine.

## II. BACKGROUND[1]

### A. The Parties

Plaintiff Anne K. Willis ("Plaintiff") is the daughter of the late Lila G. Inskeep ("Lila") and the administrator of her estate.[2] At all relevant times, Lila lived with

---

[1] Unless otherwise noted, all Docket Items ["D.I."] refer to Case No. N25C-10-217 KMV. The facts set forth herein are drawn from D.I. 1, Complaint ["Compl."] and Exhibits ["Ex."] thereto, which were incorporated by reference. The averments set forth therein are assumed to be true for purposes of the instant motion.

[2] Compl. ¶ 1-4.

3

her adult son, Plaintiff's brother, John Berry Inskeep ("John") at 4600 Griffin Drive in Wilmington, Delaware (the "Residence").[3]

Defendant Supportive Care Solutions LLC ("SCS") is a company incorporated in Delaware that provides professional guardianship services.[4] Defendant Eric Merlino (with SCS, the "Defendants" or the "Guardian") is an owner, agent, and/or employee of SCS[5] alleged to have acted within the course and scope of his employment.[6] Defendants served as the guardian of Lila,[7] from 2020 until her death in 2023, with specific powers and duties as discussed below.

**B. The Court of Chancery Guardianship Proceedings**

*1. SCS is appointed the Guardian of Lila's person and property*

In 2019, Plaintiff and John filed cross-petitions in the Court of Chancery seeking guardianship over the person and property of their mother, Lila.[8] During a contested hearing in 2020, they agreed to dismiss their cross-petitions and consent to the appointment of a professional guardian for Lila's person and property.[9] After

---

[3] *Id.* ¶¶ 5-7.

[4] *Id.* ¶ 8.

[5] *Id.* ¶¶ 8-10.

[6] *Id.* ¶ 11.

[7] Compl., Ex. J, *IMO Lila G. Inskeep*, C.M. #19229-N-SEM, at *3-4 (Apr. 13, 2021).

[8] *Id.*; *see also* Compl. ¶ 13.

[9] *Id.* at 1.

finding Lila was "a person with a disability" under 12 *Del. C.* § 3901(a)(2),[10] by Order dated March 5, 2020,[11] the Court of Chancery appointed SCS as guardian for Lila's person and property[12] with specific powers and duties.[13]

The Guardian performed court-ordered duties related to managing Lila's person and finances[14] and filed a series of petitions and status reports with the Court of Chancery.[15] The Guardian also reported to the Court of Chancery regarding its contacts with Lila's children, Plaintiff and John.[16]

---

[10] A person with a disability is someone who "[b]y reason of mental or physical incapacity is unable properly to manage or care for their own person or property, or both, and, in consequence thereof, is in danger of dissipating or losing such property or of becoming the victim of designing persons or, in the case where a guardian of the person is sought, such person is in danger of substantially endangering person's own health, or of becoming subject to abuse by other persons or of becoming the victim of designing persons." 12 *Del. C.* § 3901(a)(2).

[11] Compl. Ex. C, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM (Mar. 3, 2020) and *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM (Mar. 5, 2020).

[12] Compl. ¶¶ 14-15.

[13] *See* Compl. Ex. C; *see also* § 3902(d)(2):

> The Court shall specifically enumerate the powers and duties of the guardian appointed under this subsection, granting either of the following:
>
> a. All of the powers and duties in subchapter II of this chapter.
>
> b. Limited powers based on the needs of the person with an alleged disability. A grant of limited guardianship may specify 1 or more of the following:
>
> > 1. The limitations upon the authority of the guardian.
> >
> > 2. The areas of decision-making retained by the person with an alleged disability.
> >
> > 3. The specific, limited purpose of the guardianship.

[14] Compl. ¶16; *see also* Ex. C.

[15] *Id.* ¶ 20.

[16] *Id.* ¶ 22.

Initially the Court directed the Guardian to retain and implement recommendations from Decisions 4 Life, an independent professional evaluation service.[17] Decisions 4 Life recommended Lila be placed in an assisted living facility specializing in dementia care or, if she stayed at home, that a home health aide provide services three days per week.[18] It did not go well. In August 2020, the Guardian reported that Lila and John refused to allow the aide to provide any services and sent her away three times.[19] Thus, the Guardian discontinued the aide, but provided some support directly to Lila, including twice daily Meals on Wheels deliveries and visiting the home every two weeks to weigh her.[20] The Guardian reported Lila was not receiving appropriate medical care;[21] John continued to use Lila's car despite the court's order;[22] and John and Lila "repeatedly thwarted the Guardian's efforts to ensure Lila's health, safety, and general quality of life."[23] The Guardian recommended Lila be placed in a dementia care facility and asked for further instructions from the court.[24]

---

[17] *Id.* ¶ 18; and *id.*, Ex. D.

[18] Compl., Ex. D at 3-4.

[19] Compl., Ex. E ¶¶ 11-13.

[20] *Id.* ¶ 16.

[21] *Id.* ¶¶ 17-21.

[22] *Id.* ¶¶ 5, 22-26.

[23] *Id.* ¶ 33.

[24] Compl. ¶¶ 34-37.

The Court of Chancery issued a rule to show cause as to why John should not be held in contempt.[25] John was held in contempt after failing to appear for the hearing; however, in a late response, he provided a doctor's note indicating Lila had recently tested well on a cognitive exam.[26] The Court removed John as Lila's caregiver, including the compensation he was paid, and authorized the Guardian to enter any area of the home and remove Lila if needed for medical appointments, shopping, or for any other purpose.[27] But "[i]n light of the doctor's note submitted by John, the [court ordered the] Guardian should *not* permanently remove Lila from the home until [she] has been evaluated by a medical professional and the Guardian is assured that Lila has not recovered such that termination of the guardianship would be appropriate."[28]

Relations between the family members worsened, and disputes with the Guardian ensued.[29] In January 2021, John objected to the Guardian's fees, its communications with Plaintiff, and his termination as a caregiver, with its concomitant payment.[30] Lila objected to John's termination as caregiver, claimed the Guardian was not distributing payments as required, and stated she wished to

---

[25] Compl., Ex. F, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM (Sept. 11, 2020).

[26] Compl., Ex. F.

[27] *Id.* ¶ 4.

[28] *Id.* ¶ 5.

[29] *See* Compl., Exs. B, C, E, F, J, M, N, O, and P.

[30] Compl., Ex. G.

7

have control over her own funds.[31]  Also dissatisfied, in March 2021, Plaintiff, who had not seen her mother in over a year, wrote the court about the poor condition of the Residence, Lila's memory loss, and John's controlling conduct.[32]  Plaintiff stated John took their mother to the grocery store, but failed to bring her to visit another sibling in a nursing home.[33]  Plaintiff agreed Lila should remain in the home, but asked the court to order additional protections, including: more dementia evaluations for Lila; that Plaintiff be copied on all court correspondence and quarterly safety evaluations of the Residence; that the Guardian be ordered to call Lila at least once monthly, provide Lila with her own cell phone with pre-programmed numbers for immediate family members, and give Lila a debit card from which no cash withdrawals could be made.[34]  Plaintiff was also dissatisfied with the Guardian's lack of communication with her and its fees, but agreed SCS should continue as professional guardian.[35]  Regarding the Guardian's contacts with family members, other than Lila, Plaintiff suggested: "SCS only be required to maintain contact with [Lila] [and if she] is deemed able to make her own medical decisions, they should not be required to contact John or [Plaintiff] unless there is an emergency" or if

---

[31] *Id.*

[32] Compl., Ex. H; *See also id.* ¶ 23.

[33] *Id.*

[34] Compl., Ex. H.

[35] *Id.*

"[t]here is express concern regarding [Lila's] safety or wellbeing."[36]  The Guardian advised the Court of Chancery of its own concerns regarding Lila's competency and made recommendations to the court regarding her medical care and finances.[37]

### 2. *The Court of Chancery terminates the guardianship of Lila's person*

Lila and John hotly disputed Plaintiff's and SCS's contentions, and petitioned the Court of Chancery to terminate the guardianship,[38] relying upon a physician's affidavit attesting Lila had recovered and no longer had a disability under Delaware law.[39]  The Court of Chancery appointed an attorney *ad litem*, who investigated the matter and also recommended the Court's guardianship over Lila's person be terminated, but that its guardianship over her property be continued.[40]

During another contested hearing on March 24, 2021, the Court of Chancery observed, "[Lila] testified extensively regarding her ability to make decisions on her own behalf and [a] strong interest in doing so" and that "[her] testimony was lucid and persuasive in demonstrating her regained capacity to make medical decisions."[41] The Court reasoned that "[h]aving found that [Lila] has the capacity to make these decisions, [the court did] not have jurisdiction to impose any of the purported

---

[36] *Id.*

[37] Compl. ¶ 24.

[38] Compl., Ex. J, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM, at *1 (Apr. 13, 2021).

[39] *Id.* at 1.

[40] *Id.* at 1-2; *see also* Compl., Ex. K, Report of Attorney *Ad Litem*, dated Dec. 21, 2020.

[41] *Id.* at 2.

9

protections suggested by [SCS or Plaintiff]" and ruled, "[Lila] shall be free to make decisions regarding her person without the interference or oversight of [SCS or Plaintiff]."[42]

Accordingly, by Order dated April 13, 2021, the Court of Chancery terminated Defendants' duties as guardian Lila's person,[43] but continued the guardianship over Lila's property until another hearing could be scheduled in six months.[44]  In the interim, the Court limited the guardianship over Lila's property, ordering Defendants to: assist Lila in opening a personal bank account for her use; transfer $600 to Lila's personal account so that she could pay her own utilities; redirect the power and water bills to Lila for payment; work cooperatively with Lila; continue to ensure all other bills and expense were paid from the guardianship account; and provide an additional $500 to Lila in cash for spending money.[45]  The six months was a trial period for the Court to assess whether Lila could demonstrate diligent management of her finances.[46]  The Magistrate's Order of April 13, 2021

---

[42] Compl., Ex. K at 3.

[43] Compl., Ex. J, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM, at *3-4 (Apr. 13, 2021).

[44] *Id.*

[45] *Id.* at 4-6.

[46] *Id.* at 5; *see also* Compl., Ex. M, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM, at *1-2 (Del. Chn. Apr. 6, 2021), *aff'd*, *IMO Lila G. Inskeep*, C.M. # 19229-N-PAF (Aug. 5, 2022).

and its limited guardianship structure was affirmed over Plaintiff and John's exceptions.[47]

In September 2021, Plaintiff again complained to the Court of Chancery about the about the Guardian's lack of reporting and responsiveness to her inquiries, as well as the fees charged.[48]  She also took issue with the Court of Chancery's rulings.[49]  Plaintiff asked the Court to dismiss SCS as Guardian of Lila's property and return financial control to Lila, stating: "At this point, [Lila] just may starve to death if the court waits until a hearing in January of 2022.  I realize giving [Lila] the money that John will control it, spend it on his habits, but at least he will have extra to feed her."[50]

Lila failed to timely pay the bills[51] and so in April the Court of Chancery denied Lila and John's petition to terminate the guardianship over her property.[52]  Subsequently, on August 2, 2022, it ordered SCS to stop transferring the $600 to

---

[47] Compl., Ex. J.

[48] Compl., Ex. L.

[49] *Id.*

[50] *Id.*

[51] Compl. ¶ 28; *see also id.*, Ex. M, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM, at *1-3 (Apr. 6, 2022).

[52] Compl., Ex. M, at *1-3.

Lila for payment of utilities and resume its payment of the utilities, but continue to provide Lila $500 spending money each month.[53]

The Guardian's August 26, 2022[54] status report advised that, prior to the August 2, 2022 Order, Defendant Merlino had been going to the Residence once a month to deliver Lila's check, but because he was now about to electronically transfer the $500 directly to Lila,[55] he stopped the in-person visits.[56] Defendant Merlino stated he typically speaks to Lila once or twice per week by phone, but with fewer contacts over the last three weeks.[57] In response to Plaintiff's request to increase Lila's monthly spending amount, the Guardian explained it could hire someone to do the shopping, but that Lila was "opposed to any type of oversight."[58] He also indicated Lila continued to receive meal delivery and that he was "willing to try things such as a grocery store gift card."[59]

The Court declined Plaintiff's request to replace SCS as Guardian and appoint the Office of the Public Guardian as successor guardian due in part to SCS's

---

[53] Compl., Ex. N, *IMO Lila G. Inskeep*, C.M. # 19229-N-SEM, at *1 (Del. Ch. Aug. 2, 2022).

[54] Compl., Ex. O, Court of Chancery Judicial Action Form ["JAF"], C.M. # 19229-N-SEM (Aug. 26, 2022).

[55] *Id.* at 1-2.

[56] *Id.*

[57] *Id.* at 2.

[58] *Id.* at 2.

[59] JAF.

"continued willingness to serve based on the Court's decision."[60]  Specifically, the

Court observed:

> [It] had been concerned the relationship had deteriorated to the point
> where the guardianship could not work.  The Court is encouraged to
> hear the guardianship seems to be working okay and the Court will
> continue to use court orders and letters to assist in explaining the
> guardian's duty and role.  The Court believes SCS is the best guardian
> to serve for [Lila]."[61]

Plaintiff continued to write the Court of Chancery with concerns over her

mother's personal welfare and property, as well as the Guardian's responsiveness to

her.  On December 21, 2022, the Court denied Plaintiff's request for additional

funding for Lila's Christmas expenses.[62]  And as to Plaintiff's ongoing disputes with

SCS, the Court of Chancery explained the Guardian's limited role thusly:

> Regarding [Lila's] *home and vehicle*, I appreciate [Plaintiff's]
> concern.  The guardian of the property is charged with protecting
> [Lila's] assets and ensuring they are preserved and only used for [her]
> benefit.  *But the guardian of the property is limited when it comes to
> asserting control over [Lila's] real and tangible property*.  As such, it
> is not unreasonable for the guardian of the property to rely, to some
> extent on [Lila] to inform the guardian of the property as to any
> necessary repairs or maintenance.  I say "to some extent" because such
> reliance has limits.  For example, if the guardian of the property has
> reason to believe that real or personal property is being neglected or
> damaged such that the person with a disability's financial interests are
> put at risk, the guardian should assert greater control to protect those
> assets.

---

[60] *Id.*

[61] *Id.* at 3.

[62] Compl., Ex. P, *IMO Lila Inskeep*, C.M. # 19229-N-SEM (Dec. 21, 2022).

13

It is not clear, on the record before me, if there is such a risk to [Lila's] financial interests. Rather, [Plaintiff's] primary concern appears to be [Lila's] safety. *Because [Lila] does not have a guardian of her person, she is responsible for her own safety and should alert the guardian of her property to necessary repairs or maintenance to resolve any dangerous conditions. Thus, I will not direct the guardian to take any action regarding the home or the vehicle at this time.*[63]

On August 2, 2023, the Guardian filed its Annual Update and Medical Statement with the Court of Chancery.[64] It advised the court that its contact with Lila was "sporadic with occasional phone calls and visits, perhaps once per month."[65] The Guardian reported there were no significant problems Lila's finances, but was unable to provide a report regarding Lila's physical or mental condition because, "We have not seen the client in 6 months."[66]

*3. Plaintiff asks the Guardian to perform welfare checks on Lila*

In early October 2023, Plaintiff requested Defendant Merlino conduct a welfare check on Lila's person, home, and vehicle, during which the following email exchange took place:

October 2, 2023

Plaintiff:                                    Eric, I am just checking in to see if anyone has seen my mother recently? No one in my family has heard from her in over a year. Just would like to

---

[63] *Id.* at *2-3 (emphasis added).

[64] Compl., Ex. Q.

[65] *Id.*

[66] *Id.* at 2.

know that she has been seen and is doing okay.

October 5, 2023

Merlino (12:54 PM): We have not heard from [Lila] in quite a while. *Unfortunately, we have no authority or jurisdiction to do a wellness check.*

Plaintiff (2:54 PM): Thank you for responding. I am worried about her safety. I don't know of anyone that has seen or heard from her in months. Is her monthly allowance auto deposited or still delivered to John? Is it possible to require delivery to her? Thank you.

Plaintiff (4:23 PM): And anyone can request a wellness check, you do not need to have authority – can just be concerned.

Plaintiff (10:51 PM): Would it be possible for you to make contact with her to make sure her needs are being met? Is her garbage being picked up? Does she have any household needs? Does she need money for car repairs? The cost of living has gone up so much are her personal needs being met?

During that call, it would be the perfect time to assess her orientation and perhaps get a feel for her safety.

15

<u>October 6, 2023</u>

SCS 1:43PM:          It is deposited.[67]

On December 21, 2023, Plaintiff requested New Castle County Police ("NCCPD") conduct a welfare check on Lila, but asked that her request be anonymous.[68] Plaintiff reported to police that Meals on Wheels contacted her because they had been unable to make contact with anyone at the Residence[69] and that her aunt went to the Residence but was unable to make contact with anyone.[70] NCCPD's investigation revealed mail piled up from December 8 onward in the mailbox and strewn about meal containers, but that the house was secured, there were no odors, and the vehicle was gone.[71] A neighbor advised police that she hadn't seen Lila, but saw John coming and going, as recently as the day prior.[72] NCCPD contacted Defendant Merlino who advised he sent a co-worker out earlier that same day, but had been unable to make contact with anyone.[73] Defendant Merlino stated he had a legal right to access the property, but had no means of doing so.[74]

---

[67] Compl., Ex. S.

[68] Compl., Ex. T, New Castle County Police Report, dated December 21, 2023.

[69] *Id.* at 2.

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] Compl., Ex. T, New Castle County Police Report, dated December 21, 2023.

[74] *Id.*

16

According to police, "[Merlino] stated he would send a team over in the future with County Police to change the locks and gain entry."[75] NCCPD advised they would standby with the Guardian, if requested, when he attempted to change the locks and gain entry.[76] The police determined "there was no exigency or cause to force entry into the residence."[77]

The next day, December 22, 2023, Plaintiff emailed the Guardian:

> I reached out to you on October 3, expressing my concern for my mother's safety and well-being. To this day no one has seen or heard from her. At the time, I had asked you to reach out to her to assess if her property is well maintained. Does she have any household needs? Does she need car repairs or even home repairs? Is her heater working? Refrigerator? etc. Were you able to speak directly with her to find out if her property needs any repairs? I also expressed at that time that you speak directly to her to ascertain her needs (not just John's).

> Family members have noticed that her car has been missing for over a month from her driveway. I appreciate that you are responsible for her property. Do you know where the car is? Unfortunately, her brother passed away last week. My 92 year old aunt went to her door to let her know that he passed and about the funeral. She knocked and waited for a long time with no answer. John would normally answer for this aunt. John does not even answer his phone for her.

> My aunt also observed that the Meals on Wheels food delivery has been strewn across the front steps and yard since at least Monday. My aunt stated that it looks as if an animal has gotten into the food. It does not appear that anyone was outside the home, or they would have walked through it. There is a lot of concern over the poor appearance

---

[75] *Id.*

[76] *Id.*

[77] *Id.*

of her home and property. Do you know if anyone has checked it in the past couple of years?

A wellness check was requested, and as you know, the police were not able to get anyone to come to the door. I have been told it is within the guardian's right to change the locks to gain access to the home, and that the police will provide supervision. *Would you please do this as soon as possible to assure that her home is safe, maintained, and in working order? Of course, our main concern is her personal safety and orientation, but we are extremely thankful that someone is at least responsible for her property.*

*Again, would you please do this as soon as possible with a police escort? I sincerely just wish for my mother to be safe, and have her physical needs met including maintenance of her finances, property, etc.*[78]

### 4. The Guardian discovers John and Lila deceased in the Residence

On December 29, 2023, Defendant Merlino and a co-worker went to the Residence with a locksmith and gained entry.[79] Shortly afterward, they found John's body and called 911.[80] Lila's body was discovered by police in another room of the Residence.[81] The home was in disarray and dirty.[82]

Plaintiff was interviewed by police and advised she asked the Guardian to perform a welfare check on October 3, 2023, but the guardian never did so.[83]

---

[78] Compl., Ex. R.

[79] Compl., Ex. U, New Castle County Police Report, dated December 29, 2023.

[80] *Id.*

[81] *Id.*

[82] *Id.*

[83] Compl., Ex. S, New Castle County Police Report Supplement, dated Jan. 2, 2024.

Plaintiff then went to the home on October 14, 2023, saw John, and was advised by John that Lila was fine.[84] She also reported that a week prior, her aunt went to the Residence to notify Lila of funeral arrangements for her brother.[85] When there was no response by phone or at the door, a welfare check was called in.[86] Police responded and found the home secured.[87]

### C.  Plaintiff's Claims in Superior Court

Plaintiff claims the Guardian breached fiduciary and legal duties by not ensuring Lila's home was safe or deploying funds to ensure the integrity of her property.  At their root, however, Plaintiff's claims are that the Guardian failed to protect Lila's safety and welfare, resulting in her death. While earlier time frames are referenced, the conduct and omissions alleged in the Complaint stem from the time period Defendants SCS and Merlino served solely as guardian of the property for Lila.  Count I is a survival action brought by Plaintiff on Lila's behalf under 10 *Del. C.* § 3701 for her personal injuries resulting in death due to the Guardian's alleged failure to provide her access to a phone and adequate food or water.[88]  Count II is a wrongful death action under 10 *Del. C.* 3722(a) brought by Plaintiff

---

[84] *Id.* at 2.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] Compl. ¶¶ 49-53.

individually for her mental anguish, as well as the loss of her mother's support, services, and pecuniary benefits.[89] Count III is a common law negligence action brought on behalf of the estate under the Restatement (Second) of Torts § 323 alleging the Guardian voluntarily undertook a duty to render services to Lila and failed to "exercise reasonable care and due diligence in the performance of that duty."[90] Plaintiff contends the Guardian breached its duty to Lila under § 323 in two ways: (1) because the guardian failed to perform a series of functions associated with the property[91] and (2) because it voluntarily offered and represented to the police it would "arrange and coordinate a follow-up welfare visit," but failed to do so for eight days.[92] Count IV is a common law negligence claim, again brought by the estate,

---

[89] *Id.* ¶¶ 54-57.

[90] *Id.* ¶¶ 60-62.

[91] Plaintiff alleges Defendants breached their common law duty under § 323, *inter alia*, by:

    a. Disregarding repeated reports of uncollected Meals on Wheels deliveries;

    b. Failing to monitor status of the Residence;

    c. Failing to maintain contact with Decedent;

    d. Failing to act in the best interest of their Ward, the Decedent;

    e. Disregarding clear indications of imminent harm to Decedent;

    f. Failing to intervene and mitigate known danger earlier;

    g. Failing to ensure the Residence was habitable;

    h. Defendants omissions or acts induced reliance on the Plaintiff / Decedent, foregoing other help;

    i. Defendants failed to act as reasonably prudent guardians of the property who voluntarily offered to do a welfare check on the Decedent. (Compl. ¶ 68).

[92] *Id.* ¶ 60.

under Restatement (Second) of Torts § 324A alleging liability to a third person for negligent performance of an voluntarily assumed duty.[93] Plaintiff contends the Guardian breached its duty to Lila under § 323 by (1) "failing to conduct a welfare check until December 29, 2023" after "assuming responsibility for tasks NCCPD would otherwise have performed, [thus, ]. . .supplant[ing] NCCPD's duty to safeguard a vulnerable resident during an active welfare investigation" and "as a result, NCC did not conduct a welfare check and Plaintiff refrained from arranging an independent check, in reliance on Defendants' promise."[94] In the alternative, Plaintiff alleges she "reasonably relied upon Defendants to perform the undertaking with due care[95] [and] Decedent was harmed when Defendants failed to do so."[96] Count V sets forth a breach of fiduciary duty claim alleging Defendants breached their duties of loyalty, care, and diligence under 12 *Del. C.* § 3923, as well as the

---

[93] *Id.* ¶¶ 70-83.

[94] Compl. ¶¶ 78-80.

[95] Plaintiff alleges a litany of omissions to show Defendants breached its common law duty under § 324A:

    a. Disregarding repeated reports of uncollected Meals on Wheels deliveries;

    b. Failing to enter the home until December 29, 2023;

    c. Failing to monitor status of the Residence;

    d. Failing to maintain contact with Decedent;

    e. Failing to act in the best interest of its Ward, the Decedent;

    f. Disregarding clear indications of imminent harm to Decedent;

    g. Failing to inform NCCPD or Plaintiff that they had not performed the welfare check. (Compl. ¶ 82).

[96] Compl. ¶ 81.

March 5, 2020 Order of the Court of Chancery.[97] Count VI alleges negligence per se based upon Defendants' violation of fiduciary duties set forth in 12 *Del. C.* Chapter 39, Guardianship[98] and committing a criminal offense against a vulnerable adult under 11 *Del. C.* §§ 1105(a), (c), (d) "by recklessly endangering, neglecting, and misapplying the property of a vulnerable adult."[99] Finally, Count VII alleges the acts set forth in Counts I-VI were grossly negligent and reckless resulting in Lila's "decline, prolonged suffering, and death, and in causing the damages sustained by Plaintiff."[100]

### D. The Parties' Contentions

Defendants move for dismissal of the Complaint on two bases. First, they argue this Court lacks subject matter jurisdiction over the controversy because all the factual allegations in the Complaint stem from Defendants' fiduciary duties over

---

[97] *Id.* ¶¶ 84-94.

[98] *See id.* ¶ 96 (alleging violation of 12 *Del. C.* § 3921(c) by failing to do "whatever [was] necessary for the care, preservation and increase" of the estate); ¶ 97 (alleging violation of 12 *Del. C.* § 3922(b) by failing to deposit ward funds in properly titled, segregated accounts and promptly safeguard those assets; ¶¶ 98-99 (alleging violation of 12 *Del. C.* § 3923(e) by failing to manage and apply estate assets "solely for the ward's benefit" and "failing to obtain necessary Court approval for major disbursements"); ¶ 100 (alleging violation of 12 *Del. C.* §3910(a) by failing to report to the Department of Health and Social Services that an "impaired adult" was in need of protective services; ¶¶ 101-102 (alleging violation of 12 *Del. C.* §3913(a) by knowingly or recklessly neglecting and financially exploiting an impaired adult" or "knowingly or recklessly neglecting and financially exploiting an impaired adult, conduct made a Class A felony when the neglect results in death."

[99] *See* Compl. ¶ 103.

[100] *Id.* ¶¶ 103-110.

which the Court of Chancery has exclusive jurisdiction.[101]  Second, they contend the Complaint must be dismissed for failure to state a claim upon which relief may be granted because Defendants owed no duty to either Lila or the Plaintiff.  Plaintiff responds that her claims for survival and wrongful death are common law and statutory legal claims seeking monetary damages more akin to professional negligence than equitable claims of breach of fiduciary duty.[102]  Neither side is completely correct as discussed below.

## III.  STANDARD OF REVIEW

Rule 12(b)(1) allows a Defendant to seek dismissal of a claim based upon lack of subject matter jurisdiction.[103]  The burden rests with the plaintiff to make a sufficient showing that jurisdiction exists.[104]  "The jurisdiction of the subject matter of any controversy in any court must be determined in the first instance by the allegations of the complaint."[105]  The Court accepts the material factual allegations set forth in the Complaint as true.[106]  The Court may also consider the pleadings,

---

[101] D.I. 8, Mot. of Defendants to Dismiss Plaintiff's Complaint ["Mot.] ¶ 7.

[102] D.I. 11, Plaintiff's Response in Opposition to Defendants' Motion to Dismiss ["Resp."] at 3-4.

[103] Super. Ct. Civ. R. 12(b)(1).

[104] *Acme Mkts., Inc. v. Oekos Kirkwood, LLC*, 2025 WL 2172302, at *3 (Del. Super. July 31, 2025).

[105] *Dickerson v. Murray,* 2015 WL 447607, at *2 (Del. Super. Ct. Feb. 3, 2015) (citing *Stidham v. Brooks,* 5 A.2d 522, 524 (Del. 1939)).

[106] *Id.* (citing *Grace v. Morgan,* 2004 WL 26858, at *1 (Del. Super. Ct. Jan. 6, 2004) and, in turn, citing *Diebold v. Computer Leasing v. Commercial Credit Corp.,* 267 A.2d 586 (Del. 1970)).

23

affidavits, discovery of record, and briefs in determining whether a plaintiff satisfies that burden[107] and draws all reasonable inferences in favor of the nonmovant.[108] In deciding whether it has subject matter jurisdiction, "the Court must look beyond the language of the complaint to determine the true nature of the claim and the desired relief."[109]

Rule 12(b)(6) allows a Defendant seek dismissal of a claim for "failure to state a claim upon which relief can be granted."[110] However, the threshold showing a plaintiff must make to survive a motion to dismiss is low.[111] To survive a motion to dismiss, plaintiff need only give "general notice of the claim asserted."[112] In ruling on a Rule 12(b)(6) motion, the Court must "accept all well pleaded factual allegations as true;"[113] "accept even vague allegations as 'well pleaded' if they give opposing party notice of the claim;"[114] and "draw all reasonable factual inferences

---

[107] *Mason*, 2024 WL 4563935, at *2 (quoting *Econ. Steel*, 2020 WL 1866869, at *1).

[108] *In re Proton Pump Inhibitors Prods. Liab. Litig.*, 2023 WL 5165406, at *5 (Del. Super. Aug. 11, 2023) (quoting *Appriva S'holder Litig. Co.*, LLC v. EV3, Inc., 937 A.2d 1275, 1284 n.14 (Del. 2007)); *see also Degregorio v. Mariott Intl., Inc.*, 2018 WL 3096627, at *5 (Del. Super. June 20, 2018).

[109] *Defranco v. Pordham*, 2015 WL 4751217, *1 (Del. Super. Aug. 11, 2015) (quoting *Mehiel v. Solo Cup Co.*, 2007 WL 901637, at *2 (Del. Super. Mar. 26, 2007)).

[110] Del. Super. Ct. Civ. R. 12(b)(6).

[111] *Doe v. Cahill*, 884 A.2d 451, 458 (Del. 2005).

[112] *Id.* (citing *Ramunno,* 705 A.2d 1029,1034 (Del. 1998) (citing *Solomon v. Pathe Communications Corp.,* 672 A.2d 35, 38 (Del.1996))).

[113] *Spence v. Funk*, 396 A.2d 967, 968 (Del. 1978)).

[114] *Central Mortgage Co. v. Morgan Stanley Mortgage Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

in favor of the party opposing the motion."[115] Dismissal of a claim is warranted "only if it appears with reasonable certainty that the plaintiff could not prove any set of facts that would entitle [her] to relief."[116] Notwithstanding this liberal standard, the Court is required to scrutinize the Complaint. In considering whether dismissal is appropriate, the Court need not accept conclusory assertions that are unsupported by specific factual allegations.[117] Nor is it required to "accept every strained interpretation of the allegations proposed"[118] or draw "unreasonable inferences in the plaintiff's favor."[119]

## IV. ANALYSIS

The issues before the Court are (1) whether the fiduciary claims alleged in the Complaint are within the exclusive jurisdiction of the Court of Chancery or may entertained by this Court; (2) whether all the claims set forth in the Complaint are fiduciary in nature and remedy; and (3) whether the allegations in the Complaint state a claim upon which relief may be granted. For the reasons explained below, the Court grants the motion to dismiss certain counts (and portions of counts)

---

[115] *Id.*

[116] *Doe*, 884 A.2d at 458 (citing *Spence*, 396 A.2d at 968)); *Central Mortgage,* 27 A.3d at 536 (a complaint will survive if the plaintiff may recover under any reasonably conceivable set of circumstances susceptible of proof).

[117] *Ramunno*, 705 A.2d at 1034.

[118] *Malipede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *Cooper v. Cadia Pike Creek*, 2021 WL 409156, at *1 (Del. Super. Feb. 4, 2021).

[119] *Windsor I, LLC v. CWCapital Asset Mgt., LLC,* 238 A.3d 863, 871 (Del. 2020).

25

alleging of breach of fiduciary duty based upon this Court's lack of jurisdiction, but denies the remainder of the motion.

### A. Fiduciary claims are within the statutory jurisdiction of the Court of Chancery.

The Court of Chancery has statutory jurisdiction over breach of fiduciary duty claims against the guardian of a disabled adult separate from the Court's inherent jurisdiction over matters of equity.[120] "The express language of 12 *Del. C.* § 3901[121] specifically vests the Court of Chancery with jurisdiction to appoint guardians for disabled persons."[122] Conversely, there is no statute vesting Superior Court with jurisdiction over adult guardianships.[123] Instead, "[t]he Superior Court has jurisdiction over matters in law."[124] This is nothing particularly new. Indeed, "guardianship[s have] traditionally fallen within the jurisdiction of . . . equity courts, both with respect to their English common-law antecedents and in [their] current

---

[120] *In re Markel,* 254 A.2d 236, 238 (Del. 1969) (citations omitted).

[121] Section 3901empowers the Court of Chancery "to appoint guardians for the person or property, or both, of any person with a disability." 12 *Del. C.* § 3901(a).

[122] *In re Arzuaga-Guevara,* 794 A.2d 579 (Del. 2001).

[123] *Delaware Health Corp. v. Grim*, 2014 WL 6666570, at *2 (Del. Super. Nov. 19, 2014) (citing Del. Const. art. IV, § 7 and 10 *Del. C.* § 541).

[124] *Compare with In re Arzuaga-Guevara,* 794 A.2d 579 (recognizing the Family Court of Delaware was granted concurrent jurisdiction over minor guardianships by statute).

statutory incarnation."[125]   Accordingly, this Court has no jurisdiction over the fiduciary claims.

**B.    The fiduciary claims in the Complaint are dismissed for lack of jurisdiction.**

Defendants argue they are entitled to dismissal of the *entire* Complaint because *all* the acts or omissions alleged in the Complaint concern fiduciary duties Defendants owed to Lila, as the guardian of her property, over which the Court of Chancery has exclusive subject matter jurisdiction.[126]  In opposition, Plaintiff first argued this Court has jurisdiction over all the claims alleged in the Complaint[127] because they are legal claims, seeking monetary damages under common law and statutory tort theories;[128] however, Plaintiff softened that stance at oral argument regarding the claims in Counts V and VI.[129]

A party's identification of a particular claim as legal or fiduciary in nature is not dispositive on the issue of jurisdiction.  Subject matter jurisdiction is "not

---

[125] *IMO A.N.,* 2020 WL 7040079, at *8 (Del. Ch. Nov. 30, 2020) (quoting *IMO J.T.M.*, 2014 WL 7455749, at *1 (Del. Ch. Dec. 31, 2014)).

[126] Mot. ¶ 7 (citing *In the Matter of A.N.*, 2020 WL 7040079, *13 (Del. Super.); *Dickerson*, 2015 WL 447607, *7 (citing *McMahon v. New Castle Assoc.*, 532 A.2d 601, 602 (Del. Ch. 1987) (Court of Chancery has exclusive subject matter jurisdiction to adjudicate a breach of fiduciary claim)).

[127] Resp. at 2-3.

[128] Resp. at 3-4.

[129] Plaintiff acknowledged Count V and portions of Count VI were claims for breach of fiduciary duty in her oral argument. *See Willis v. Supportive Care, et al.,* C.A. No. N25C-10-217, Transcript of January 22, 2026 Motions Hearing ["Tr."] 21:22- 22:6.

conferred simply by the 'incantation of magic words.'"[130]  Nor is "[t]he mere fact that one of the parties is a fiduciary, trustee or guardian…suffic[ient] to confer jurisdiction upon the Court of Chancery" over a cause in which the claim is purely legal.[131]  "There is nothing in the statute which in terms purports to confer upon the Court of Chancery jurisdiction to decide all controversies which the guardian may provoke through his efforts to assemble the ward's property."[132]  Instead, to determine the question of subject matter jurisdiction, this Court must assess the "nature of the wrong alleged and the remedy available."[133]

Count V of the Complaint is a direct claim the Defendants breached their fiduciary duties over which the Court of Chancery has statutory jurisdiction. Plaintiff alleges Defendants breached their duties of loyalty, care, and diligence under 12 *Del. C.* § 3923, as well as the Court of Chancery's March 5, 2020 Order.[134] It follows that based upon the nature of the claim set forth in Count V, exclusive jurisdiction lies in the Court of Chancery.  Plaintiff acknowledged as much during oral argument on the motion to dismiss.[135]

---

[130] *Grim,* 2014 WL 6666570, at *2 (citing *McMahon,* 532 A.2d at 603).

[131] *Id.* (emphasis added) (citing *In re Markel,* 254 A.2d at 239).

[132] *Markel,* 254 A.2d at 239.

[133] *Grim,* 2014 WL 6666570, at *2 (citing *McMahon,* 532 A.2d at 603).

[134] Compl. ¶¶ 84-94.

[135] Tr. 21:22- 22:6 ("[I]n terms of fiduciary duty, arguably, yes, it is clear that breach of fiduciary duty claims belong in the Court of Chancery.  We don't dispute that.  Our case does not hinge on Count 5 and the elements of Count 6, on negligence per se that refer to guardian duties.")

28

But the same is also true for other counts in the Complaint alleging breaches, by acts or omissions, of fiduciary duties. Problematically, however, the Complaint blends its claims. Each claim incorporates by reference all the preceding facts when many of those facts relate to fiduciary duties alone. For example, Count I is a survival action brought on behalf of Lila's estate under 10 *Del. C.* § 3701, for her personal injuries and death due to SCS's "alleged failure to provide Lila with access to a phone, and adequate food or water."[136] Any obligation the Guardian had to provide Lila with a phone, food, or water arises from its fiduciary duties to her as the Court of Chancery's ward. Count II realleges and incorporates by reference all the preceding facts – and Count I.[137] Count III alleges common law negligence under the Restatement (Second) of Torts § 323, in part, based upon the Guardian's duty to perform his fiduciary obligations associated with the property.[138] Count IV, a

---

[136] Compl. ¶¶ 49-53.

[137] *See* Compl. ¶ 54.

[138] Plaintiff alleges Defendants breached their common law duty under § 323 by:

 a. Disregarding repeated reports of uncollected Meals on Wheels deliveries;

 b. Failing to monitor status of the Residence;

 c. Failing to maintain contact with Decedent;

 d. Failing to act in the best interest of their Ward, the Decedent;

 e. Disregarding clear indications of imminent harm to Decedent;

 f. Failing to intervene and mitigate known danger earlier;

 g. Failing to ensure the Residence was habitable;

 h. Defendants omissions or acts induced reliance on the Plaintiff / Decedent, foregoing other help;

29

common law negligence claim under Restatement (Second) of Torts § 324A[139] first alleges Defendant agreed and failed to conduct a welfare check, but then also relies upon facts pertinent to fiduciary obligations associated with the property.[140] Count VI alleges negligence per se based upon Defendants' violation of fiduciary duties set forth in 12 *Del. C.* Chapter 39, Guardianship,[141] and engaging in a criminal act against a vulnerable adult.[142]  So while Count VI is predicated on the breach of a

---

i. Defendants failed to act as reasonably prudent guardians of the property who voluntarily offered to do a welfare check on the Decedent. (Compl. ¶ 68).

[139] Compl. ¶¶ 70-83.

[140] Plaintiff alleges Defendants breached their common law duty under § 324A by:

a. Disregarding repeated reports of uncollected Meals on Wheels deliveries;

. . .

c. Failing to monitor status of the Residence;

d. Failing to maintain contact with Decedent;

e. Failing to act in the best interest of its Ward, the Decedent;

f. Disregarding clear indications of imminent harm to Decedent[.]

[141] *See* Compl. ¶ 96 (alleging violation of 12 *Del. C.* § 3921(c) by failing to do "whatever [was] necessary for the care, preservation and increase" of the estate); ¶ 97 (alleging violation of 12 *Del. C.* § 3922(b) by failing to deposit ward funds in properly titled, segregated accounts and promptly safeguard those assets; ¶¶ 98-99 (alleging violation of 12 *Del. C.* § 3923(e) by failing to manage and apply estate assets "solely for the ward's benefit" and "failing to obtain necessary Court approval for major disbursements"); ¶ 100 (alleging violation of 12 *Del. C.* §3910(a) by failing to report to the Department of Health and Social Services that an "impaired adult" was in need of protective services; ¶¶ 101-102 (alleging violation of 12 *Del. C.* §3913(a) by knowingly or recklessly neglecting and financially exploiting an impaired adult" or "knowingly or recklessly neglecting and financially exploiting an impaired adult, conduct made a Class A felony when the neglect results in death."

[142] *See* Compl. ¶ 103 alleging Defendants violated 11 *Del. C.* §§ 1105(a), (c), (d) "by recklessly endangering, neglecting, and misapplying the property of a vulnerable adult."

fiduciary duties, as evidence to establish negligence per se, it calls upon this Court to first make findings that fall within the statutory purview of the Court of Chancery.

With that said, however, Plaintiff's assertion of fiduciary claims alongside legal claims alleging acts or omissions by a tortfeasor, who happens to be a guardian, does not automatically convert the overall controversy to one over which the Court of Chancery has exclusive jurisdiction.[143]  The Court of Chancery is not the only place where a guardian may sue or be sued and guardians do not have blanket immunity from all civil lawsuits just because they are acting in a fiduciary capacity during the relevant time frame.

Portions of the claims alleged in Counts I, II, III, IV, VI, and VII, although germinated during the course of fiduciary relationship, do not exclusively allege fiduciary claims.  Plaintiff claims the ward was injured and died as a result of the guardian's failure to perform *voluntarily assumed* duties on behalf of the ward and the New Castle County Police ("NCCPD") outside the fiduciary relationship. Additionally, the remedies sought are compensatory and punitive damages, whereas the most severe remedy that may be imposed by the Court of Chancery for a breach of fiduciary duty is removal of the fiduciary or a fine.[144]  Because portions of Counts

---

[143] *See Markel*, 254 A.2d at 239.

[144] See *IMO J.C.E.,* C.M. 16615-N-SEM (Del. Ch. Feb. 15, 2022) (holding the most severe remedy in the Court of Chancery's arsenal was removal of one or both of the co-guardians and dismissing all claims relating to how the co-guardians discharged their duties prior to the ward's death).

I, II, III, IV, and VII are causes of action that involve legal rights and remedies, at this early juncture, this Court concludes plaintiff has made a sufficient showing they are within the Superior Court's subject matter jurisdiction and, accordingly, retains jurisdiction over them.

In sum, because Count V of the Complaint is a direct claim of breach of fiduciary duty, and portions of Counts I, II, III, IV, and VI are predicated upon the breach of fiduciary duties, over which the Court of Chancery has statutory jurisdiction, the Court **GRANTS** dismissal as to the entirety of Court V and the above-referenced portions of Counts I, III, VI, VI, and VII subject to the plaintiffs' right to transfer these claim to the Court of Chancery under 10 *Del. C.* § 1902 within sixty days. But to the extent Plaintiff's legal claims fall outside the guardian's fiduciary duties, this Court retains jurisdiction. Thus, Defendants' Motion as to the portions of Counts I, II, III, IV, VI, and VII that allege purely legal claims is **DENIED**.

### C. Plaintiff alleges facts sufficient to support a claim for negligence under the Restatement (Second) of Torts.

Defendants further argue dismissal of the entire Complaint is warranted under Rule 12(b)(6) because Plaintiff fails to state a claim for negligence upon which relief may be granted. Specifically, Defendants contend the Complaint fails to plead a duty of care, because any duty Defendants owed to Lila's person was terminated by

the Court of Chancery's Order of April 13, 2021,[145] and any duty Defendants owed to guard her property was fiduciary in nature.[146] In opposition, Plaintiffs argue there are sufficient facts in the Complaint to support a claim Defendants voluntary undertook legal duties under Sections 323 and 324A of the Restatement (Second) of Torts outside their fiduciary duties.[147] Plaintiff argues the critical period that the Court should consider is December 21 through December 29, 2023, during which Defendant Merlino voluntarily agreed to conduct a welfare check on Lila and then failed to do so for eight days.[148] The parties' assertions require critical review, and the Court moves with caution given the incomplete record before it at this early stage in the proceedings.

### 1. Negligence Generally

In order for Plaintiff or Lila's estate to recover damages under Delaware's survival or wrongful death statutes, Plaintiff must show Defendants were negligent.[149] To bring a successful negligence claim, a plaintiff must prove that: (1)

---

[145] Mot. ¶¶ 8-9 (citing Compl. at ¶ 25 and Compl., Ex. J (stating, "[Lila] shall be free to make decisions regarding her person without the interference or oversight of the guardian or Ms. Willis.").

[146] *Id.*

[147] Resp. at 5-6.

[148] *Id.*

[149] *Rogers v. Christina Sch. Dist.*, 73 A.3d 1, 7 (Del. 2013)(citing 10 *Del. C.* § 3721(5)(stating that "[w]rongful act" means "an act, neglect or default including a felonious act which would have entitled the party injured to maintain an action and recover damages if death had not ensued") and *id.* § 3722(c) ("If a person whose wrongful act caused the death of another dies before an

the defendant owed a duty of care, (2) the actor breached that duty, and (3) the breach proximately caused the injury to the plaintiff.[150] "Negligent behavior is usually defined as the failure to meet the standard of care which the law requires. However, liability for negligence is limited by the scope of the legally defined duty."[151] That is, "before liability may be imposed, 'an antecedent duty of care with respect to the interest involved must be established.'"[152] Plaintiff bears the burden of to establish defendant owed a legally recognized duty of care to the plaintiff.[153] "Absent such duty, a defendant cannot be held liable for negligence, no matter how harmful or reprehensible his conduct may be."[154] Whether a duty exists is a question of law for this Court to decide.[155] "If the trial judge finds the defendant owed no duty of care to the plaintiff, the defendant is entitled to judgment as a matter of law."[156]

---

action under this section is commenced, the action may be maintained against a personal representative")).

[150] *Murray v. Mason,* 244 A.3d 187, 194 (Del. Super. Ct. 2020) (citing *Doe v. Bradley,* 2011 WL 290829, at *7 (Del. Super. Jan. 21, 2011) ("*Bradley I*").

[151] *Rogers,* 73 A.3d at 7 (quoting *Furek v. Univ. of Delaware,* 594 A.2d 506, 516 (Del. 1991)).

[152] *Rogers*, 73 A.3d at 7 (quoting *Furek,* 594 A.2d at 516).

[153] *See* Restatement (Second) of Torts § 395; *Massey-Ferguson, Inc. v. Wells,* 383 A.2d 640, 642 (Del.1978) (citing § 395 that the plaintiff holds the burden to establish that the defendant failed to exercise the care of a reasonably prudent person under these circumstances).

[154] *Doe v. Massage Envy Franchising, LLC*, 2024 WL 3220281, at *15 (Del. Super. Ct. June 28, 2024).

[155] *Doe v. Massage Envy*, 2024 WL 3220281, at *15 (citing *Murray v. Mason*, 244 A.3d at 194).

[156] *Navaretta v. Duong,* 2024 WL 40033401, at * (Aug. 29, 2024) (citing *Culver v. Bennett,* 588 A.2d 1094, 1098 (Del. 1991)).

To determine whether there is a duty of care, Delaware courts generally follow the guidance of the Restatement (Second) of Torts.[157]  Section 284 states: "Negligent conduct may be either: (a) an act which the actor as a reasonable man should recognize as involving an unreasonable risk of causing an invasion of an interest of another, or (b) a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do."[158]  The Restatement draws a distinction between affirmative acts and omissions.[159]  Unlike a duty that arises in performing an affirmative act, "one who merely omits to act" generally has no duty to act, *unless* "there is a special relation between the actor and the other which gives rise to the duty."[160]  The duty to act is "largely confined to [ ] situations in which there was some special relation between the parties, on the basis of which the defendant was found to have a duty to take action for the aid or protection of the plaintiff."[161]  Section 314 further states, that, "[t]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."[162]  However, the Restatement Second also provides exceptions to this general "no duty to act" rule

[157] *Rogers*, 73 A.3d at 7.

[158] *Id.*

[159] *Rogers*, 73 A.3d at 7 (citing Restatement (Second) of Torts § 302 cmt. a.).

[160] *Id.*

[161] *Id.* at 8.

[162] Restatement (Second) of Torts § 314.

based on the actor's "performance" of an undertaking, including those set forth in §§ 323 and 324A.[163]

### 2. Restatement (Second) of Torts § 323 and § 324A

Plaintiff argues Defendants assumed duties of care under the Restatement (Second) of Torts § 323 and 324A when Defendant Merlino allegedly told the police he would seek to have the locks changed on the home and gain entry.[164] Even taking this fact as true, Defendant argues the Supreme Court's decision in *Rogers v. Christina School District*[165] forecloses any liability because Section 323 is limited to property owners—and, here, the Guardian did not own the property at issue.[166]

Section 323 of the Restatement (Second) of Torts, Negligent Performance of an Undertaking to Render Services, sets forth the requirements for an assumed duty of care:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if:
>
> > (a)  his failure to exercise such care increases the risk of such harm, or

---

[163] *Anderson v. Russell,* 2012 WL 1415911 (Del. Super. Apr. 18, 2012) (recognizing §§ 323, 324, and 324A as exceptions).

[164] *See* Compl. Counts III and IV.

[165] *Rogers,* 73 A.3d at 7.

[166] Supplement in Support of Motion of Defendants to Dismiss Plaintiff's Complaint ["Defs.' Reply"] at 9 (citing *Rogers*, 73 A.3d at 9).

36

(b)      the harm is suffered because of the other's reliance upon the undertaking.[167]

Section 324A, Liability to Third Person for Negligent Performance of Undertaking, states:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a)      his failure to exercise reasonable care increases the risk of such harm, or

(b)      he has undertaken to perform a duty owed by the other to the third person, or

(c)      the harm is suffered because of reliance of the other or the third person upon the undertaking.[168]

This Court acknowledges that in *Rogers*, the Supreme Court held, "Section 323 *only addresses the duty of care to a person physically on the property of the entity owing the duty*,"[169] but its analysis was far more nuanced than Defendants assert here. Relying on its prior decisions in *Jardel v. Hughes*[170] and *Furek v. University of Delaware*,[171] the *Rogers* Court considered the liability of another landowner, a

---

[167] *Rogers*, 73 A.3d at 8 (citing Restatement (Second) of Torts § 323 (1965).

[168] Restatement (Second) of Torts § 324A (1965).

[169] *Rogers*, 73 A.3d at 9 (emphasis added).

[170] *Jardel Co., Inc. v. Hughes* 523 A.2d 518, 524 (Del. 1987).

[171] *Furek,* 594 A.2d at 516.

school district, for the injuries and death of a student who committed suicide off school grounds.[172] In *Jardel*, the Court had previously concluded a landowner, shopping mall owner, could not be held liable for injuries sustained by a tenant's employee who was abducted in the mall parking lot and later raped.[173] The crucial inquiry for the Court in *Jardel* had been the degree to which the shopping mall owner, who voluntarily undertook a security program, should have foreseen the danger at issue.[174] Conversely, in *Furek,* the Court concluded a different landowner, a university, *could be held liable* for injuries sustained by a student in a fraternity hazing incident that occurred on university property, even though the injury had been sustained by a fraternity pledge in a house owned by the national fraternity and controlled by fraternity members.[175] Like *Jardel, Furek* turned on foreseeability of the risk of harm.[176] And because the Court found "the university was aware of the dangers of hazing and repeatedly emphasized its policy of discipline for hazing infractions, but did nothing to intervene or prevent the hazing incident," liability under § 323 was actionable.[177] While the *Furek* Court noted "an insurer is not an insurer of the safety of its students nor a policeman of student morality, [it]

---

[172] *Rogers*, 73 A.3d at 9.

[173] *Id.* (citing *Jardel,* 523 A.2d at 524).

[174] *Id.*

[175] *Id.* (citing *Furek,* 594 A.2d at 520).

[176] *Id.* (citing *Furek,* 594 A.2d at 514).

[177] *Rogers*, 73 A.3d at 9 (citing *Furek,* 594 A.2d at 514).

nonetheless, . . .has a duty to regulate and supervise foreseeable dangerous activities occurring on its property."[178]  Applying the holdings of *Jardel* and *Furek* to the facts of *Rogers*, another landlord-invitee case, the Court concluded:

> Section 323 *only addresses the duty of care to a person physically on the property of the entity owing the duty*. In both *Jardel* and *Furek,* liability could be imposed because the injury from a reasonably foreseeable harm occurred *on the defendants' property.* Here it is conceded that the injury occurred off of school grounds. Section 323 is inapplicable.[179]

Subsequent cases considering the liability of landlords for injuries that occurred offpremises have appropriately hewed to the Court's holding *Rogers*.  These include *Murray v. Mason,*[180] *Buford v. Ligon,*[181] and *Connolly v. Theta Chi Fraternity, Inc.*[182]

Yet there is nothing in the text of Sections 323, 324A, or their Comments that limit liability to *property owners*. Moreover, post-*Roger*s, this Court's holdings in

---

[178] *Id.* (citing *Furek,* 594 A.2d at 522).

[179] *Id.* at 9.

[180] *Murray*, 244 A.3d at 197 (holding a dog bite victim who brought a negligence action against a nonprofit animal shelter, after being attacked in a private residence months after the dog was released from the shelter, and who had not alleged any facts suggesting that she was ever on the property of the shelter failed to state a claim under § 323).

[181] *Buford v. Ligon*, 2021 WL 5630048, at *7 (Del. Super. Nov. 30, 2021) (holding a duty existed under §323 where a university's affirmative action to provide security on university-owned property could be found to increase the risk of harm to invitees on the property).

[182] *Connolly v. Theta Chi Fraternity, Inc.,* 2018 WL 1137587, at *8 (Del. Super. Feb. 28, 2018) (holding there was no liability for a property owner under § 323 where injury occurred off property).

*Truitt v. Winder,*[183] *Rogerson v. Delaware Surgical Group, P.A.,*[184] *Anderson v. Russell,*[185] and *Doe 30's Mother v. Bradley*[186] had nothing to do with the ownership of property in determining the applicability of § 323. Accordingly, this Court cannot conclude *Rogers* or its progenitors, *Jardel* and *Furek,* stand for the proposition that § 323 of the Restatement is limited to premises liability. In fact, the *Furek* Court defined the application of Section 323 far more broadly:

> In our view, Restatement § 323 offers a more persuasive rationale for University liability, and a jury instruction invoking § 323 was unsuccessfully sought by Furek at trial. . . § 323 addresses the duty owed by one who assumes direct responsibility for the safety of another through the rendering of services *in the area of protection*. As the Restatement comment makes clear, this section "applies to any undertakings to render service to another which the defendant should recognize as necessary for the protection of the other person" and the harm to be protected against results from negligence in "performance of the undertaking or from failure to exercise reasonable care to complete it or to protect the other when he discontinues it." If one "takes charge and control of [a] situation, he is regarded as entering into a relation which is attenuated with responsibility." W. Prosser, *Handbook of Torts,* 56 (2nd ed. 1972). This provision of tort law is encapsulated in Restatement § 323 and has been recognized by this Court. *See Jardel Co. v. Hughes,* 523 A.2d 518, 524 (Del. 1987).[187]

Further, in *Furek,* the Court frowned upon the University's attempt to disclaim liability based upon a lack of direct control over the property at issue:

---

[183] *Truitt v. Winder*, 2025 WL 3487494 (Del. Super. Ct. Dec. 4, 2025).

[184] *Rogerson v. Delaware Surgical Group, P.A.,* 2025 WL 2491252 (Del. Super. Aug. 29, 2025).

[185] *Anderson v. Russell,* 2012 WL 1415911 (Del. Super. Apr. 18, 2012).

[186] *Doe 30's Mother v. Bradley*, 58 A.3d 429 (Del. Super. 2012).

[187] *Furek,* 594 A.2d at 520.

40

Premises control is not determined in absolute terms. A landowner may exercise control in certain areas while relinquishing it in others. In *Jardel,* this Court, in discussing the issue of landowner control in a parent-subsidiary context, noted that where the parent corporation exercised "direct operational control in several management areas, including security decisions....the jury was entitled to draw the inference, at least in the area of security arrangements that the landowner-parent exercised direct control. [*Jardel*,] 523 A.2d at 526-527. If control includes authority to direct, restrict and regulate, the University with its significant involvement in the regulation of fraternity life, particularly in the area of hazing, may be deemed to have exercised supervision over the use of its property to permit "at least the inference of control." For the purpose of testing the sufficiency of the evidence to withstand the granting of a directed verdict, Furek was entitled to the benefit of that inference.[188]

Because the facts of the case *sub judice* do not concern the liability of a landowner for an off-premises injury, this Court concludes *Rogers* does not control the outcome.

Here, Count III (§ 323) alleges Defendant Merlino, outside the scope of his fiduciary duties as Guardian, made a gratuitous undertaking to render a service to Lila (entry to the property), which he should have recognized was necessary for Lila's protection or the protection of her property, and his failure to exercise such care may have increased the risk of such harm. Likewise, Count IV (§ 324A) alleges Defendant Merlino, outside the scope of his fiduciary duties, made a gratuitous undertaking to render a service to NCCPD (entry to the property to check on Lila's welfare), which he should have recognized was necessary for Lila's protection or the protection of her property, and his failure to exercise reasonable care in that

---

[188] *Id.* at 522.

undertaking, may have increased the risk of such harm to Lila, or he undertook to perform a duty owed by the NCCPD to Lila, or a harm was suffered because of the reliance of NCCPD. Thus, taking the facts of the Complaint as alleged and the reasonable inferences that flow from them as true, as this Court is required to do at this juncture, Plaintiff has adequately stated a claim under Sections 323 and 324A of the Restatement (Second) of Torts.

Discovery is necessary to sufficiently develop the record to determine whether these claims may ultimately succeed as a matter of law. But right now, it is simply too early to tell, and the Court is unwilling to grant dismissal based on the limited record that exists. Accordingly, Defendants' Motion to Dismiss Counts I, II, III, IV, VI, and VII for failure to state a claim is **DENIED**.

## III. CONCLUSION

Defendants' motion to dismiss the Complaint's claims of breach of fiduciary duty is **GRANTED**, without prejudice, for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), unless Plaintiffs seeks leave within 60 days to transfer the matter to the Court of Chancery. The remainder of Plaintiffs' motion is **DENIED**. Because the Complaint blends fiduciary and legal claims within every Count, except Count V, the parties are to meet and confer regarding which portions of each claim must be excised from the Complaint and prepare an appropriate form of order.

**IT IS SO ORDERED.**

     /s/ *Kathleen M. Vavala*     
The Honorable Kathleen M. Vavala
